# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
## MARCH SESSION, 1993

FILED

January 5, 1996

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | C.C.A. No. |
| Appellee, | ) | 01-C-01-9209-CC-00290 |
| | ) | |
| | ) | LINCOLN COUNTY |
| VS. | ) | |
| | ) | HON. WM. CHARLES LEE, JUDGE |
| | ) | |
| CARLA JO FITCH, | ) | |
| | ) | (MURDER 1ST DEGREE) |
| Appellant. | ) | |

FOR APPELLANT:

RAYMOND W. FRALEY, JR.
205 E. Market Street
P.O. Box 572
Fayetteville, TN   37334

RICHARD McGEE
Washington Square Two
Suite 417
222 Second Avenue, North
Nashville, TN   37201

FOR APPELLEE:

CHARLES W. BURSON
ATTORNEY GENERAL & REPORTER

EUGENE J. HONEA
ASSISTANT ATTORNEY GENERAL
450 James Robertson Parkway
Nashville, TN   37243-0485

WEAKLEY E. BARNARD
ASST. DISTRICT ATTORNEY GENERAL
Marshall County Courthouse
Lewisburg, TN   37091

OPINION FILED: _____

REVERSED AND REMANDED FOR A NEW TRIAL

ALLEN R. CORNELIUS, JR.
SPECIAL JUDGE

# **O P I N I O N**

A Lincoln County jury convicted Carla Jo Fitch of murder in the first degree. The trial court approved the verdict and imposed a sentence of life in the Tennessee State Penitentiary for Women. Her motion for a new trial was denied, and she has appealed to this Court. The defense presents four main issues, of which the first three issues have sub-issues.

For the reasons hereafter set forth in this opinion, the judgment of the trial court is reversed and remanded for a new trial.

Defendant by her first issue questions whether the evidence in this record is sufficient to sustain the verdict of murder in the first degree, or did the trial court err in not granting her motions for judgment of acquittal at the conclusion of the state's proof and/or at the end of all the proof. Also, she insists that the trial court erred in not granting a new trial upon its expression of dissatisfaction with the degree of homicide for which she was convicted.

After selecting the jury on January 14, 1992, introduction of evidence began the next day.

The state's first witness was Mike Hobson, a criminal investigator for the Fayetteville, Tennessee Police Department. Hobson's testimony began with an explanation of the city's 911 telephone system which records the time of the conversations taking place through the system. The tapes of these calls are generally recycled every six months unless there is a request to save a recording, as was done in this case. The saving process is effected by making a copy of the original tape.

A copy of the tape and a transcript thereof were entered into the record without objection. The court instructed the jury that the tape was evidence but not the transcript which was merely an aid. Mr. Hobson related that the 911 call came

in at 7:48 on October 21, 1991. The code was 1038, a shooting. He identified the first voice to be heard as Officer Mike Hill, then a lady's voice as Mrs. Fitch, the defendant, and a third voice as that of Sergeant Posey. The tape was then played for the court and jury. Other than establishing the defendant's name, address, telephone number and "My husband was cleaning guns or something and one of them's gone off sir," there was little else to be gained from this recording.

Deputy Sheriff Bobby Fitch, of the Lincoln County Sheriff's Department, was the next to testify. He responded to the 911 call on Lincoln Road, in Sunnyvale Estates, the home of Carla Fitch. He received the call at 12 minutes before 8:00 p.m. He identified the defendant during the trial as the person at the residence when he arrived. Inside the house, after seeing the body, he asked the defendant what had happened. She reported that her husband had been cleaning a weapon and it had gone off. She stated that she was in the kitchen when the gun fired. The officer had found the body of the victim on the middle cushion of the sofa. A .22 pistol and a 12 gauge automatic shotgun were on the sofa to the victim's right. In front of the victim, between the sofa and the coffee table was a 20 gauge single-shot shotgun. Also on the coffee table was a gun case which covered a .357 Desert Eagle automatic pistol still in its box. At the end of the table was a cased deer rifle.

Deputy Fitch examined each gun to determine if it was loaded, none but the 20 gauge shotgun showed any sign of having been loaded, it contained an empty cartridge. He extracted the hull and turned it over to Deputy Bradford. Fitch stated that this particular shotgun shell had "7½" shot stamped on it. He further testified that while checking the guns in the living room he found none of the items normally used to clean guns.

Officer Fitch was cross-examined extensively with regard to the exclusion from his report that Carla Fitch told him that she was in the kitchen when the shooting occurred and her inquiry if there was any kinship between Officer Fitch and the deceased. Officer Fitch explained that he had responded to an accidental

shooting report and did not consider these factors important when making his report as he did not conduct the investigation thereafter.

Deputy Sheriff Jeff Bradford, Criminal Investigator, was the next witness for the state. He was acquainted with the deceased and the defendant prior to this occurrence. Upon receiving notice of the shooting, he went to the scene and was briefed by Officer Fitch before entering the house through the front door into the living room. Within two or three minutes of seeing the body he became aware that he knew the deceased.

Mr. Bradford proceeded to look for Mrs. Fitch who came from the kitchen area. After making inquiries as a friend as to her condition and who she had notified, he asked her what had happened. He asked her location in the house when the gun fired. She replied that she was in the kitchen. This was an oral statement made to Mr. Bradford within 10 minutes of his arrival on the scene. He then asked Deputy Stiles to take Mrs. Fitch across the street to a friend and, in accordance with the department policy, performed a gun shot test.

Detective Bradford introduced the cotton swabs from the Gunshot Residue Kit used on the hands of the deceased. Without objection, the cotton swabs in the kit used on the hands of the defendant were introduced. Bradford closed his direct examination with a description of the deceased's wound.

Bradford's cross-examination consisted of retracing his direct examination. An attempt was made to question this officer relative to the work of other officers on this investigation. The effectiveness of which was for the jury to determine.

Officer Harvey Stiles, the state's next witness, testified regarding the procedure he followed in taking and processing the Gunshot Residue test on Mrs. Fitch's hands. (The chain of evidence was stipulated). He, also, presented and read to the court and jury a written statement which Mrs. Fitch wrote herself that evening at his request. The statement was:

> I, Clara Fitch, was cleaning up the kitchen from the evening meal. The children were in bed. Dwight was getting his guns out to see if they needed cleaning, polishing et cetera. I went into the living room to sit with him and he was telling me about each gun. I listened to him and when I went to give him the one I was holding and it went off. I then proceeded to call 911.

This officer was cross-examined and released.

Chief Deputy Jimmy Mullin, of the Lincoln County Sheriff's Department, testified that following the funeral for the victim, the defendant with Detective Bradford came to his office at the county jail. In his presence Bradford read Mrs. Fitch her Miranda "warnings."

The Chief questioned Mrs. Fitch as to any problem she might have as an employee of the Corps of Engineers with close men friends. Her answer was negative. When asked about Mr. Miskelly, she answered that they were just friends, but then admitted that they were having an affair. When asked if Miskelly had given her money she replied, "No," later conceding that Miskelly had deposited a hundred dollars into the Central Bank of Alabama.

When the Chief asked her what happened the night of her husband's death, she related that she was sitting on the coffee table in front of her husband and they were talking and he was showing her some guns and she had one laying across her lap and that she was handing him the gun and it went off.

The Chief obtained a large stick to serve in place of a gun, and instructed her to position him as her husband was and then take a position as she had been sitting. When he handed her the stick she said, "I just handed it to him like this and it went off." (A demonstration was conducted by the Chief and the district attorney in front of the jury.)

Mr. Don Payne, the defendant's supervisor at the Corps of Engineers at Huntsville, Alabama on and after September 17, 1991, was the next witness.

Herman Miskelly was not employed in his department during the time but had been earlier. Miskelly was then employed in another department but visited his branch at times. After September 17, 1991 Miskelly began coming once or twice a week to his department 's office and was observed talking with the defendant. On other occasions he saw them together in other areas of the building.

Mr. Payne had three conversations with the defendant about her work. The third conversation took place "around" the middle of October, 1991. She advised him that her problems were not at work but at home and that she was apartment hunting without her husband's knowledge. Payne stated that she told him that her distraction would not be coming back into the office. This was the middle of October.

Mona Gretal Case Harlan, an assistant medical examiner for Davidson County and surrounding counties testified that she performed the autopsy on the body of the deceased. The defense offered to stipulate her qualification, however, the assistant district attorney had her state her special skills.

Mrs. Harlan determined that the death of James Dwight Fitch was caused by a near gunshot wound to the head which caused massive injury to the face, the skull, and the brain.

Sharon R. Franklin, an expert on fingerprint examination with the Tennessee Bureau of Investigation, testified that she found no identifiable latent fingerprint on Exhibit No. 24, a 20 gauge shotgun. She examined another exhibit, No. 34, a spent Remmington Peters 20 gauge shotgun shell casing marked "7½" and found no latent prints at all.

Don Carmen, a TBI forensic scientist assigned to perform broad firearms identifications, which includes training in gunshot distance determination, safety, and mechanical functions of various firearms, examined State Exhibit No. 24, the 20 gauge shotgun, on December 7, 1991. He test fired the gun and found no defects or malfunction. He described the gun as being fired only in the single-

action phase. One must manually pull back the hammer into cocked position, then pull the trigger. This was the only way he could get the gun to fire. This witness was cross-examined then released.

The state's next witness was Robert Daniel Royce, an employee of the crime laboratory of the TBI, as a forensic scientist specializing in analysis of gunshot primer residue. He stated that he had been qualified as an expert forensic scientist in the courts but not as an expert in gunshot residue. A jury out hearing resulted in the state, defense, and the court reaching the conclusion that this witness qualified as an expert.

Mr. Royce's testimony then proceeded to his analysis of Exhibit No. 27, the gunshot residue kit utilized on the deceased, James Dwight Fitch. He found no gunshot residue on the right or left back of deceased's hands, a small amount was found on the right palm. This usually indicates that the person either handled the gun or had his palm exposed to the muzzle of the blast.

Mr. Royce next proceeded to Exhibit No. 28, the gunshot residue kit used on Carla Jo Fitch's hands. A significant amount of gunshot residue was present on her right palm. There was a larger amount of residue on the left palm than on the right. A significant amount of gunshot residue was found on the right back and a small amount on the left back of Mrs. Fitch's hands. These elements indicated that the person could have fired, handled, or was in close proximity when a firearm discharged.

Mr. Ron Bedford, Jr., a leasing agent for the Flagstone Apartments of Madison, Alabama, was the state's next witness. On October 16, 1991 between 11:00 a.m. and 2:00 p.m. he became acquainted with Carla Jo Fitch at the 514 unit Flagstone Apartment complex. Mrs. Fitch was looking for an apartment to lease. Mr. Herman Miskelly was with her as they jointly entered the office. Miskelly introduced himself and pointed to the lady next to him and commented "this is my daughter, Carla Fitch." Mrs. Fitch shook Bedford's hand and said "Nice to meet you." Bedford identified the defendant as the individual Miskelly introduced as

his daughter. He showed them a three bedroom apartment. On November the 9th or 13th Miskelly signed an application listing Carla J. Fitch as "co-tenant." The lease agreement was signed by Miskelly. Bedford asked Miskelly if he was going to live in the apartment and he replied, "No." Mr. Bedford concluded his cross-examination by stating that Miskelly told him the defendant would be living in the apartment.

The next witness was Karen L. Mims, a leasing agent for Hunt Clubs Apartments in Huntsville, Alabama. Ms. Mims identified the defendant as being at the Hunt Club complex on October 21, 1991, at approximately mid-afternoon to look for an apartment. She was with a person identified as Herman Miskelly. The apartment was for Miskelly but the defendant was more verbal on what she did and did not like about the unit, referring to the color of the carpet and appliances. This was one of the smaller units which rented for $290 plus $85 for furniture. Miskelly took an application which he returned later that day. As a government employee, Miskelly was only required to pay a $20 application fee and that was paid by check written on a joint account of Mrs. Fitch and Miskelly. (At the time of the trial Miskelly was still a tenant in this apartment.)

Ms. Elizabeth Little Allen, as an employee of the Central Bank of the South, of Alabama, with a branch in Huntsville, testified that on October 18, 1991 Herman Miskelly and Carla Fitch each signed the signature card for the opening of a joint checking account, which was still open at the time of this trial.

Next the state presented, consecutively the deceased's sister, Dimetria Cook, his father, James Fitch, and mother, Wanda. Each witness testified that they had observed the defendant and Herman Miskelly under suggestive circumstances for an immediately bereaved widow and an individual with a living spouse. Within the first few days after the death each asked the defendant what had happened and had received inconsistent answers such as, "I don't know," and "she didn't want to talk about it, that she would tell me later."

Wanda Fitch, the deceased's mother testified that the defendant and her two children came to her home the night of October 21, 1991, "after 11." When she asked the defendant what had happened, the defendant told her that the victim "was sitting on the couch cleaning his gun. He was rubbing gook -- you know, ma, that stuff that he put on the gun." The defendant did not mention being in the kitchen when the gun fired. She told her mother-in-law that she was sitting beside the victim but made no mention of having handed him the gun.

Wanda Fitch's testimony also referred to other conversations with the defendant:

    (1)    October 21, the defendant told her that the 20 gauge shotgun that caused the death was the gun that the victim had taught her to shoot.

    (2)    On October 22, defendant said she was sitting beside the victim on the couch while he cleaned the gun.

    (3)    On October 23, defendant said she was sitting on the coffee table in conversation with the victim. At this point she gestured to infer that the gun suddenly fired. The defendant did not mention handing the shotgun to the victim.

Wanda Fitch further testified regarding a telephone call to her home on October 23, 1991, at approximately 6:30 or 7:00 a.m. Her home had three telephone extensions, one each in the kitchen, the living room, and her bedroom. She was in her bedroom when the phone rang. When she picked up the receiver, the defendant was already speaking on the phone in the kitchen. Without objection, she identified the third party as Herman Miskelly. The caller asked the defendant how things were going. According to Wanda Fitch, the defendant replied, "just as I premised." When the district attorney asked if the word was "promised" the witness answered, "no." Then the district attorney asked the witness if she knew what the word premised meant. The defense's objection was sustained by the court, but no request was made for curative instructions to the jury.

Wanda Fitch continued to recall that the defendant in the conversation with Miskelly stated that they needed to talk in depth because they were the only two who knew what had happened. Also, the defendant told Miskelly that a $200 deposit in their account would be fine.

The defendant and her two children stayed with Wanda Fitch until November 13, 1991 when she and the children moved to Huntsville.

Through cross-examination of Wanda Fitch the defense established that the victim and the defendant were married in 1983 when he was 20 years old and she was 16 and pregnant. The newlyweds moved in with his parents for a few months before moving into a mobile home. Four months after the baby was born the defendant took full time employment, acquired her GED certificate, and took the ACT test for college. At the time of victim's death, the defendant was away from home four nights a week, reportedly attending school.

Continuing the cross-examination of Wanda Fitch, the defense inquired if she had received a phone call on the evening of this tragedy. The witness said she had called the victim, who was preparing to bathe and he told her that he would return her call. At approximately 7:30 p.m. they had their conversation. Over the objection of the state, the defense was allowed to ask if the victim had not inquired whether a gun he could not locate was at her home? "He said it was in the bedroom, he thought, but said he was not sure."

The defense also cross-examined Wanda Fitch regarding two written statements she prepared and sent to the sheriff's office prior to the defendant and her children moving from her home in November. She stated that her son delivered one of her statements to the police officer and she carried the other. She testified that while at the police station she was questioned as to what she had written but did not make a recorded statement.

The defense moved that Wanda Fitch be excused subject to recall.

The defense then raised a question pertaining to Jenck's material. At a bench conference, defense counsel stated that he had specifically asked the district attorney if he had any statements from Wanda Fitch and had been told, "No." The district attorney informed the court that he had gone through the file and had no statement made by this witness. At this point the jury was excused for the night. A hearing was conducted before the court adjourned. This is the subject of defendant's issue number 2(B) and will be treated there.

Upon resuming court the next morning the state announced that it was closing its case in chief.

The defense's first witness was Lori Renegar, who for two years had been the baby-sitter for the Fitches. She described both as loving parents. She had worked at the Fitches' home on October 21, 1991 and that morning saw both Dwight, the victim, and Carla, the defendant. Each appeared normal. She saw Dwight, looking tired, when he came home from work but she left the house before Carla came in. The witness was unaware of any marital problems. On cross-examination she stated she did not know Herman Miskelly.

The defense recalled Officer Dennis Stiles and retraced his earlier testimony.

The next item of consideration was the availability of Sergeant Jeff Bradford who was reported physically unable to attend court and a likely candidate for hospitalization. The court recessed to take Officer Bradford's deposition which was read to the jury. This deposition dealt with the statements from Wanda Fitch and whether there were blood splatters on the wall behind the couch. The witness deposed that there was no blood splattering on the wall but indicated there was a small amount on the back of the couch, with most of the blood being on the pillows with the victim's body.

The next witness for the defense was Donna Ranking, a family friend and neighbor of two and a half years. On October 19, 1991 she had attended a church

hay-ride where she saw the defendant, her husband, and daughter. Everything appeared fine. On October 21, this witness responded to the defendant's call by going to her home. In Ranking's opinion the defendant appeared dazed. After this incident the witness had occasions to talk with the defendant but thought better of it.

On cross-examination, Donna Ranking testified that on the night of October 21 she noticed a red spot, about the size of a thumb nail, on the defendant's right pant leg at the upper thigh. This witness did not know Herman Miskelly.

Carla Fitch, the defendant, testified on her own behalf. At the time of the trial, January 14, 1992 she was 25 years of age. She related that her mother and father had divorced when she was 18 months old. At age six her mother was sick and unable to care for her, so the state placed her in foster care until she was 10. She then moved in with her sister and brother-in-law, they divorced and she was again placed in the care of the state, in a youth home, then a foster home, then to live with an aunt and uncle for two years, back to the foster care program with two more families. She attended the Lincoln County High School. During her sophomore year she met and began dating the victim and from this regular relationship she became pregnant. She and the victim were married on August 3, 1983.

The defendant described how after living with her husband's family for four months, she and the victim established a home in a house trailer and later moved to the home where the victim died. During this time they cared for their daughter, and she bore a son. With the assistance of her mother-in-law and a babysitter, she obtained the equivalent of a high school diploma. In December 1984 she took the ACT test and began taking night classes one or two nights a week while working apart from the home.

Defendant's testimony indicated a desire for continuous educational and employment advancement. In July, 1990 she became employed by the Corps of

Engineers with a job description of specifications clerk. In October 1991 she attended Athens College two nights a week.

In response to questions regarding her marriage she referred to her husband as a good man and father, particularly close to his daughter. In her opinion her marriage was not strong during the last two years as she and her husband were developing different interests. She described Wanda Fitch as "the mother I didn't have."

Defense attorney asked defendant about Herman Miskelly, who she had met at the Corps of Engineers in August or September of 1990. At that time his age was 53 years. Miskelly had formerly been in her department and had come in to greet his former co-workers and friends. A relationship evolved with Miskelly. For the first five months they passed in the halls and spoke, then they started to spend more time together within the complex. In July of 1991 the relationship became stronger.

Defendant testified that Miskelly walked by her desk one day when she had linked her computer with the personnel management office in Atlanta which had a job listing twice a month. Thus, Miskelly became aware that she was looking for a better job. Miskelly arranged for them to meet with his nephew, from Georgia, who's business was to establish fitness centers in the Southeast. On a Saturday in the fall, she "dressed up," and her husband kept the children while she and Miskelly had an interview for a fitness center franchise where she would be the manager and Miskelly would be the owner. On this day they visited sites on which to locate. After the interview the nephew presumably went home. She and Miskelly went to Florence to look at a business and from this they decided to open the joint bank account on October 18.

Interspersed in defendant's testimony leading up to the death of her husband are references to diminishing strength of her marriage. She testified repeatedly how her husband cared for the children and did not suspect her relationship with Miskelly. In late September she consulted with her attorney, without her

husband's knowledge, regarding a divorce. He suggested a trial separation. When asked if she made any decisions after consulting with the lawyer she replied, "they weren't final, but they were pretty much so."

Defendant conceded that during her involvement with Miskelly, she continued her marital relationship with her husband. Saturday October 5th was her birthday. She and her husband had planned to go to Chattanooga, check into a motel, go out to eat and ride around. They started by driving on Highway 64 towards Winchester, then between 2:00 and 3:00 had dinner at the Smokehouse at Monteagle. They next "wound up in Tullahoma" at the Chrysler Dealership looking for a car for her as her husband wanted her to have a reliable vehicle.

Defendant testified that there was not much talk between them so they headed back to their home in Fayetteville. They purchased some wine and obtained some video movies before going home. Her attorney asked her how she felt knowing her husband was trying to make her happy on this particular Saturday while she was involved with Miskelly. Her answer was, "I felt awful."

Near the end of her direct examination the defendant related her version of her husband's death. She stated she was sitting on the coffee table so he would not lay his guns there. He was talking about the guns and telling her that the shotgun, exhibited in this case, would be a good one for her to learn to shoot. He wanted her to hold it to feel how heavy it was. She held it for just a second and as she was giving it back to him it went "off."

Defendant concluded her direct examination by denying that she had loaded the shotgun or that she intentionally shot her husband. She denied using "premised," or any word of that nature, in a telephone conversation with Herman Miskelly.

The district attorney cross-examined the defendant, who conceded that she had outgrown her husband. She first met Miskelly in August or September of 1990 and their relationship progressed. The prosecutor asked about the park

located on Monte Sano Mountain which is approximately 15 minutes east of Huntsville proper and the Corps of Engineers. Defendant concurred in the prosecutor's description of reaching the top of that mountain by a narrow road into a wooded area with bushes and foliage. She recalled going there with Miskelly. She acknowledged twice having sexual relations with Miskelly in the park on top of Monte Sano. She was questioned as to her direct testimony of twice leaving work and going to a motel with Miskelly where they engaged in sexual relations. She placed these occurrences as taking place in late August or early September.

Continuing defendant's cross-examination, she confirmed that around lunch time October 21st, the day of her husband's death, she left work with Miskelly looking for him an apartment and furniture to purchase. Many questions were asked regarding buying furniture which lead to prosecutor asking "so you have two apartments full of furniture?" Defendant's answer was "some in both." Again, she was asked about sex with Miskelly since October 5th. Her first response was that she did not remember if they had, then she changed her answer to "yes." The prosecutor asked her if she had told any of the police officers involved in this case that she had held the shotgun to see how heavy it was, she replied that she could not recall. It developed that her husband had a total of one hundred and thirty thousand dollars of life insurance which to her best knowledge she was the beneficiary.

The cross-examination of the defendant ended with her denying the content of the telephone call which her mother-in-law testified she overheard the defendant tell Miskelly that they had to talk because "we are the only two that know what happened." After a few questions on re-direct she was excused.

William Richard Smith testified for the defense relative to the proposed franchise for the ladies health club. Ms. Rhonda Brown, a former neighbor and friend of the defendant at the time of the event, testified that she had not perceived any marital problems between the Fitches. The defense then closed its case. The state offered no rebuttal.

The defense made its motion for a judgment of acquittal which was overruled, then the court and lawyers discussed the jury instructions. The court allowed the defense to place in the record an offer of proof from Dewayne Melvin Hill, Sr. whose testimony as an expert had been disallowed. The court then adjourned to return the next morning when the lawyers made their arguments to the jury which were followed by the court's jury instructions. At 10:20 a.m. the jury left the courtroom to deliberate. It returned at 4:45 p.m. and announced it had found the defendant guilty of murder in the first degree. The jury was polled and all agreed. The court accepted and pronounced judgment upon the verdict.

Motions for a judgment of acquittal and a new trial were overruled and the defendant gave notice of an appeal.

On appeal defendant's first issue is the sufficiency of the evidence.

When the sufficiency of the evidence is challenged the standard for review by an appellate court is, whether after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307 (1979); *State v. Duncan*, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). In determining the sufficiency of the evidence, this court should not reweigh or reevaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 836 (Tenn. 1978). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956); *Farmer v. State*, 574 S.W.2d 49, 51 (Tenn. Crim. App.), *cert. denied*, (Tenn. 1978).

Defendant was tried and convicted by a jury. A guilty verdict from the jury, approved by the trial judge, accredits the testimony of the state's witnesses and resolves all conflicts in favor of the state. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Hatchet*, 560 S.W.2d 627, 630 (Tenn. 1978). On appeal, the state is entitled to the strongest legitimate view of the evidence and all

reasonable or legitimate inferences which may be drawn therefrom. *State v. Cabbage*, 571 S.W.2d at 836.

While the evidence against defendant was largely circumstantial, a criminal offense may be established solely by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973); *Marable v. State*, 313 S.W.2d 451, 456-57 (Tenn. 1958); *State v. Hailey*, 658 S.W.2d 547, 552 (Tenn. Crim. Ap.), *perm. to appeal denied*, (Tenn. 1983); *State v. Lequire*, 634 S.W.2d 608, 614 (Tenn. Crim. App. 1981), *perm. to appeal denied*, (Tenn. 1982). Before an accused may be convicted based upon circumstantial evidence alone, however, the facts and circumstances "must be so strong and cogent as to exclude beyond a reasonable doubt every other reasonable hypothesis save the guilt of defendant." *State v. Crawford*, 470 S.W.2d 610 (Tenn. 1971). In other words, "[a] web of guilt must be woven around the defendant from which she cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." *Id*. at 613.

Since a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, *State v. Grace*, 493 S.W.2d 474 (Tenn. 1973), the defendant has the burden in this court of illustrating that the evidence is insufficient to support the verdict. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court will not disturb a verdict on sufficiency grounds unless the facts contained in the record, and any inferences which may be drawn from the facts, are insufficient as a matter of law to support the guilty verdict. *Id*.

The defendant has failed to meet the burden required of her to overturn the jury's verdict. The evidence introduced at the trial was sufficient for a rational trier of fact to conclude that the defendant committed the intentional, premeditated and deliberate murder of her husband, James Dwight Fitch. There is no merit in the issue questioning the sufficiency of the evidence.

The trial court did not err in failing to enter a judgment of acquittal at the conclusion of the state's proof and at the conclusion of all the proof.

Part B of defendant's first issue is that the trial court erred in not granting a new trial when it expressed *dissatisfaction* with the degree of homicide of which the defendant had been convicted. The court's main comments were:

> To be honest with you the trial court has some reservations regarding the degree of homicide that was involved in this case, but upon consideration of all the evidence, the court must find that the jury reached the proper results in this case and will credit the jury's verdict.

The trial court's reservation is found on page 1055 of the record.

The state in its brief, on page 29, writes that the trial court weighed the evidence and was "satisfied" with the verdict. This court fails to find where the trial court expressed either satisfaction or dissatisfaction, or other word or term in approval or disapproval of the jury's verdict. *See* Rule 33(f) Tennessee Rules of Criminal Procedure; and *State v. Barone*, 852 S.W.2d 216, 218-219 (Tenn. 1993).

In the clause "the trial court *has* some reservations regarding the degree of homicide" the use of the verb "has" in the third person singular present, is indicative of the trial court having some reservation at the time of the hearing on the motion for a new trial. The trial court then stated that: "but upon consideration of all the evidence, the court *must* find that the jury reached the proper results in this case and will credit the jury's verdict." The word "must" indicates a compulsion or obligation to credit the verdict of the jury. What is lacking in the conclusion is the resolution of the trial court's reservation regarding the degree of homicide involved in this case.

In *State v. Burlison*, 868 S.W.2d 713, 719 (Tenn. Cr. App. 1993), the court held "the fact it had no independent authority to function as a thirteenth juror does not negate the obligation to review the trial court's action under Rule 33(f) for error." Thus, if the record reflects that the trial court disagrees with the verdict or otherwise expresses its dissatisfaction with the verdict, given its view of the weight of the evidence, the appellate courts have consistently held that it is error for the trial court to refuse to grant a new trial. (Citations omitted).

The trial court, having expressed some reservations regarding the degree of homicide that was involved in this case, was required to grant a new trial under Rule 33(f). *See Miller v. Doe*, 873 S.W.2d 346 (Tenn. App. 1993), also see Judge Highers' concurring opinion.

For the reasons stated in considering this issue the judgment of the trial court is reversed and the cause is remanded to the trial court for a new trial in accordance with the provisions of Rule 33(f) of Tennessee Rules of Criminal Procedure.

Defendant's second issue for review simply states:
PROSECUTORIAL MISCONDUCT

Defendant presents sub-issue "A. T.R.CR.P. 16" which asserts that statements made by the defendant were introduced in the state's case in chief without complying with defendant's pre-trial discovery rights.

Defendant presents sub-issue "B. T.R.CR.P. 26. NEWLY DISCOVERED EVIDENCE AND DEFENDANT'S MOTION FOR NEW TRIAL." This sub-issue is then presented in two unrelated parts.

Defendant presents sub-issue "C. EXCULPATORY EVIDENCE." This sub-issue does not indicate the "Exculpatory Evidence."

Defendant concludes with sub-issue "D. FINAL ARGUMENT." This sub-issue complains of the state's closing argument.

Defendant's brief introduces her second issue in such a wide scope that it tempts Rule 10(a), Tennessee Court of Criminal Appeals; and Rule 27(4) T.R.A.P.

From our study, there is nothing in the present record pertaining to this second issue that would produce a full dismissal of defendant's case; therefore, the issue is denied.

The defendant's third issue is presented in two parts, A and B. She seeks to establish that reversible error was committed by either the trial court or the district attorney in not allowing her expert witness to testify before the jury.

This court will consider issue three as having one part, that being whether the trial court committed reversible error in its ruling.

During a jury out period, Mr. McGee addressed the court stating that Mr. Dewayne Marvin Hill, the next witness for the defense, would be asked to testify as an expert and give testimony on soot as it related to discharge of firearms, and on the issue of blood splattering. The trial court inquired if Mr. Hill was offered as an expert in those divisions of forensic science. The response was affirmative.

Generally, the allowance of expert testimony and the qualifications of expert witnesses are matters entrusted to the discretion of the trial court. There can be no reversal on appeal absent clear abuse of that discretion. *State v. Williams*, 657 S.W.2d 405, 411 (Tenn. 1983). *See* Rule 702 of the Tennessee Rules of Evidence.

In order to uphold the admission of expert testimony, four factors must appear in the record:

    (1)    The witness must be an expert;

    (2)    The subject matter of the witness' testimony must be proper;

    (3)    The subject matter must conform to a generally accepted explanatory theory; and

    (4)    The probative value of the witness' testimony must outweigh its prejudicial effect.

The voir dire of the witness covered thirty-one pages of testimony. His background testimony was that he had been involved in various aspects of law enforcement for approximately 14 years and had been tendered as an expert in homicidal event reconstructions. He obtained his GED Certificate while in the Marines. He testified that, "Primarily, I have had EMT -- emergency medical technician -- training." He provided an ambulance service in a rural community. He was Chief of Police with one part-time assistant in a community of 700 people. He attended various schools regarding crime investigation. He was with the Department of Defense for eight years where he received in-service training two and one-half hours every other week. This entailed various security and police functions. From 1979 to 1982, he held a Federal Firearms Ammunition Manufacturers License.

Mr. Hill's testimony regarding his interest, study, and work in the fields of gunshot soot and blood splatterings was interesting; however, it did not demonstrate to the trial court that Mr. Hill qualified as an expert. The record does not establish that the trial court abused its discretion. We find no merit to this third issue.

Defendant's fourth and last issue suggests error in the trial court charging the jury that premeditation may be "formed in an instant." As previously noted, this trial began January 15, 1992 and ended January 18, 1992. No objection was made to this part of the charge as it was normally given by the court in a first degree murder case. On June 1, 1992 the Tennessee Supreme Court, in *State v. Brown*, 836 S.W.2d 530, corrected this portion of the charge. In *Brown*, the Supreme Court held that deliberation requires some time interval between the decision to kill and the act itself. The Supreme Court concluded it was time to abandon an instruction that tells the jury that premeditation may be formed in an instant.

There is now *State v. West*, 844 S.W.2d 144 (Tenn. 1992) for consideration in regard to defendant's issue herein. In *West*, *supra*., it is stated that while it remains true that no specific length of time is required for the formation of a cool,

dispassionate intent to kill, *Brown* requires more than a "split second" of reflection in order to satisfy the elements of premeditation and deliberation. The *West* court then commented that without evidence that the killing was willful, malicious, premeditated, and deliberate, the court could not uphold a conviction for first degree murder.

Judge Wade, writing for this court in *State v. Hassell*, C.C.A. 02-C-01-9202-CR-00038, at Jackson, filed December 30, 1992, covered *Brown* in detail and concluded our appellate court was obligated in these instances to determine the sufficiency of the evidence for both premeditation and deliberation. The *Hassell* panel noted the issue was not raised in the motion for a new trial, nor was it raised in the present. Both cases predated *Brown*. Had these cases been properly preserved for appeal they would be subject to the harmless error analysis. Each case would stand or fall on the facts. This panel concurs.

At this point the portion of the trial court's jury instruction on the subject of first degree murder for the current case is set forth verbatim from the record:

> As to the charge of Murder in the First Degree, for you to find the defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> (1) That the defendant unlawfully killed James Dwight Fitch;
>
> (2) That the killing was intentional and;
>
> (3) That the killing was deliberate. A deliberate act is one performed with cool purpose; and
>
> (4) That the killing was premeditated.
>
> A premeditated act is one done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. Such intent or design to kill may be conceived and deliberately formed in an instant. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. It is sufficient that it preceded the act, however short the interval. The mental state of the accused at the time she

allegedly decided to kill the deceased must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation. If the design to kill was formed with deliberation and premeditation, it is immaterial that the accused may have been in a state of passion or excitement when the design was carried into effect. Furthermore, premeditation can be found if the decision to kill is formed during the heat of passion, but the accused commits the act after the passion has subsided.

Having examined this issue, the law and the facts pertaining thereto, any error in the jury instruction was harmless.

This issue is without merit.

The judgment below is reversed and remanded for a new trial.

_____
ALLEN R. CORNELIUS, JR.
SPECIAL JUDGE

_____
JOSEPH M. TIPTON, JUDGE

_____
PENNY J. WHITE, JUDGE